1
2
3
4
5

Yosef Peretz (SBN 209288)
yperetz@peretzlaw.com
David Garibaldi (SBN 313641)
dgaribaldi@peretzlaw.com
PERETZ & ASSOCIATES
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: 415.732.3777
Facsimile: 415.732.3791

6

Attorneys for Plaintiff ALPHA CAPITAL, LLC

7
8

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

9

Case No. **'23 CV 1265 L    DEB**

10
11

ALPHA CAPITAL, LLC, a Nevada Limited
Liability Company

**COMPLAINT AND DEMAND FOR JURY
TRIAL**

12
13

Plaintiff,

14

v.

15
16

DMITRY KHANUKOV, an individual;
DOES 1-10

17

Defendants.

1.  Violation of the Defend Trade Secrets Act,
    18 USC 1836, *et seq*.;
2.  Violation of the State of California's
    Uniform Trade Secrets Act, Civil Code §§
    3426, *et seq*.;
3.  Violation of the State of California's
    Comprehensive Computer Data and Fraud
    Access Act, California Penal Code § 502;
4.  Violation of the Computer Fraud and Abuse
    Act, 18 USC 1030, *et seq*.;
5.  Breach of Contract;
6.  Intentional Misrepresentation;
7.  Fraudulent Concealment;
8.  Conversion;
9.  Negligence; and
10. Unlawful, Unfair, and Fraudulent Business
    Practices in Violation of Bus. & Prof. Code
    §§ 17200 and 17203, *et. Seq*.

18
19
20
21
22
23
24

Plaintiff ALPHA CAPITAL, LLC("Alpha") complains and alleges as follows:

25

**I.    INTRODUCTION**

26
27
28

1.     This is an action brought by Alpha against its former consultant, Defendant
DMITRY KHANUKOV ("Khanukov"), for various business, corporate and employment torts
and breach of contract relating to their business relationship.

2.     Alpha is a technology consulting firm based in San Diego County, California founded in October 2019 that offers full-service advisory services in connection with blockchain technology and capital formation.

3.     On June 1, 2022, Alpha engaged Khanukov as a consultant to lead Alpha's technology team as Director of Technology pursuant to an industry-standard Consulting Agreement (the "CA").

4.     At the time of Khanukov's engagement by Alpha, Khanukov also executed a Confidential Information and Invention Assignment Agreement (the "CIIA"). The CIIA provided that Khanukov agreed to refrain from engaging in business activities that would compete with Alpha's during the term of his engagement with Alpha, as well as provisions assigning all right, title, and interest in any work product of Khanukov within the scope of his engagement with Alpha were assigned to Alpha.

5.     In September 2022, Alpha's and Khanukov's business relationship began to deteriorate due to Khanukov's unprofessional and tortious conduct. Khanukov misappropriated trade secrets from Alpha, began to limit his availability, and (as Alpha only recently discovered) launched a side project that competes directly with GoToCrowd, LLC ("GoToCrowd"), an Alpha subsidiary for which Khanukov was a key project manager.

6.     In early June 2023, Khanukov asserted that he no longer worked for Alpha. Khanukov's behavior left Alpha with no choice but to remind Khanukov of his obligations under the CIIA and the CA. After terminating his consulting engagement with Alpha, Khanukov refused to communicate with Alpha personnel and withheld passwords, work product, billing contact information for Alpha's service providers, code repositories for Alpha's projects, website files, and other information and work product that had been under Khanukov's control through his engagement with Alpha (the "Assets").

7.     Without the Assets, Alpha has not been able to conduct business as usual and its entire business has gone dark.

8.     Alpha, therefore, seeks to recover actual damages, general damages, civil penalties, statutory damages, and punitive damages it suffered as a result of Khanukov's wrongful conduct. Alpha also seeks injunctive relief to require Khanukov to deliver all Assets under his control that are rightfully the property of Alpha. It also seeks to obtain complete ownership over

the Assets and all Alpha-affiliated work product. Finally, Alpha seeks to recover its costs of this lawsuit, including its reasonable attorneys' fees.

## II.    PARTIES

9.    Alpha is a Nevada limited liability company registered to do business in the State of California and founded in October 2019, and is headquartered in Rancho Santa Fe, California. It offers full-service technology and business development consulting service with a specialization in blockchain and related technologies.

10.    Alpha is a resident of San Diego County, California.

11.    Khanukov is a resident of Miami-Dade County, Florida. He was a consultant for Alpha from June 2022 until June 2023.

12.    Defendants Does 1 through 10 are sued herein under fictitious names. These defendants are in some way liable for the damages sustained by Alpha. Upon information and belief, Does 1 through 10 acted with and on behalf of Khanukov (collectively, "Defendants") in the alleged violations. Alpha does not, at this time, know the true names or capacities of said unnamed defendants, but prays that the same may be inserted herein when ascertained.

13.    Alpha is informed and believes and thereon alleges that each of the Defendants designated as a doe is responsible in some manner for the events and happenings herein, and that Alpha's injuries and damages as hereinafter set forth were proximately caused by Defendants. Alpha is informed and believes and thereon alleges that at all times herein mentioned, each of the Defendants sued herein was the agent and/or employee of each of the remaining Defendants, and each of them, was at all times acting within the purpose and scope of such agency and employment.

## III.    JURISDICTION AND VENUE

14.    Jurisdiction and venue are proper because Alpha's claims and causes of action arose in the County of San Diego, because the CIIA specifies venue and personal jurisdiction over Khanukov in the state and federal courts in California, because records relating to the claims made in this action are located in San Diego County, because key witnesses of Alpha reside in San Diego County, and because Alpha is headquartered in and regularly does business in San Diego County.

//
//

**IV.    FACTUAL ALLEGATIONS**

    **A.    Alpha Engaged Khanukov as a Consultant**

    15.    Khanukov has been an information technology specialist for many years.

    16.    Alpha engaged Khanukov as a consultant to serve as Alpha's Director of Technology on a full-time basis on June 1, 2022, pursuant to the CA. A copy of the CA is attached hereto as **Exhibit 1**.

    17.    At his engagement, Khanukov also executed the CIIA. A copy of the CIIA is attached hereto as **Exhibit 2**.

    18.    The CIIA provides the following key provisions:

    a.    "I understand and acknowledge that my engagement by Company creates a relationship of confidence and trust with respect to Company's Confidential Information (as defined below) and that Company has a protectable interest therein." [CIIA Section 1.1.]

    b.    "I hereby assign to Company any rights I may have or acquire in such Confidential Information and recognize that all Confidential Information will be the sole and exclusive property of Company and its assigns." [*Id.*]

    c.    "During the period of my engagement, I will promptly and fully disclose to Company in writing all Inventions authored, conceived, or reduced to practice by me, either alone or jointly with others." [*Id.* Section 2.5.]

    d.    "I acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of my engagement and which are protectable by Copyright are 'works made for hire,' pursuant to United States Copyright Act (17 U.S.C., Section 101)." [*Id.* Section 2.7(a).]

    e.    "I agree that Company will exclusively own all work product that is made by me (solely or jointly with others) within the scope of my engagement, and I hereby irrevocably and unconditionally assign to Company all right, title, and interest worldwide in and to such work product. I understand and agree that I have no right to publish on, submit for publishing, or use for any publication any work product protected by this Section, except as necessary to perform services for Company." [*Id.* Section 2.7(b).]

f.    "I agree that during the period of my engagement by Company, I will not, without Company's express written consent, directly or indirectly engage in any engagement or business activity which is directly or indirectly competitive with, or would otherwise conflict with, my engagement by Company." [*Id.* Section 4.]

g.    "When I leave the employ of Company, I will deliver to Company any and all drawings, notes, memoranda, specifications, devices, formulas and documents, together with all copies thereof, and any other material containing or disclosing any Company Inventions, Third Party Information or Confidential Information of Company. I agree that I will not copy, delete, or alter any information contained upon my Company computer or Company equipment before I return it to Company. In addition, if I have used any personal computer, server, or e-mail system to receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, I agree to provide Company with a computer-useable copy of all such Confidential Information and then permanently delete and expunge such Confidential Information from those systems; and I agree to provide Company access to the relevant portions of my system as reasonably requested to verify that the necessary copying and/or deletion is completed." [*Id.* Section 8.]

h.    "I agree that any threatened or actual violation of this Agreement or any of its terms will constitute immediate and irreparable injury to Company, and Company will have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that Company may have for a breach or threatened breach of this Agreement." [*Id.* Section 9.]

19.    To facilitate the work of Khanukov and his subcontractors, Alpha leased additional office space at a cost of $7,000 per month.

20.    During his consultancy with Alpha, Khanukov was the key person responsible for technical development at GoToCrowd, an Alpha subsidiary. During the approximately one year of engagement, Alpha spent approximately $265,000 in consulting fees for Khanukov and his subcontractors.

21.     As Director of Technology for Alpha, Khanukov was privy to nearly unlimited sensitive and confidential information of Alpha, including but not limited to all of the Assets.

22.     Pursuant to Section 2(b) of the CA and Section 1.1 of the CIIA, Khanukov was obliged to keep Alpha's confidential information confidential pursuant to the CIIA and the CA. [CA Section 2(b); CIIA Section 1.1.]

23.     Pursuant to Section 4 of the CIIA, Khanukov was under a duty of loyalty to Alpha during the period of his engagement with Alpha under the CIIA. He agreed that he would not engage in competitive activities without written authorization from Alpha. [CIIA Section 4.]

**B.      Khanukov Misappropriated Alpha's Confidential Information and Began Competing with Alpha**

24.     After the beginning of September 2022, Khanukov began secretly developing Go Global, a new business that competes with GoToCrowd.

25.      Khanukov updated his LinkedIn profile to show that he was associated with Go Global as of October 2022.

26.     Go Global offers services to connect investors with projects, which is essentially the same business as GoToCrowd.

27.     In January 2023, Khanukov wrote to Alpha to inform Alpha that he was closing an earlier project (disclosed in his CIIA) and starting the Go Global project, without describing the new project. Alpha did not authorize Khanukov's actions with Go Global.

28.     Upon information and belief, Khanukov used sensitive and confidential information belonging to Alpha that he was privy to, including but not limited to the Assets, to secretly develop Go Global, in secret competition with GoToCrowd and Alpha.

29.     From September 2022, Khanukov appeared to be spending less and less time on Alpha's work. He would take private calls, work from home, and limit his availability during working hours. This behavior accelerated into 2023.

30.     Development and enhancement of projects under Khanukov's direct responsibility at Alpha slowed down over the period September 2022 through June 2023. For example, GoToCrowd began integration to a new platform in November 2022, but this was only completed in April 2023, at least two months behind schedule.

31.     In June 2023, Khanukov wrote to Alpha to say that certain invoices for website servers for Alpha's projects needed to be paid, but refused to provide the invoices or billing accounts, all of which were under Khanukov's control.

32.     In June 2023, Khanukov informed Alpha that he no longer worked for Alpha.

33.     Afterwards, Alpha provided Khanukov executed copies of the CA and the CIIA and requested that Khanukov work with Alpha staff to transition his access and control over the Assets back to Alpha. Alpha deauthorized Khanukov from any authority he had with respect to such assets.

34.     Khanukov responded to Alpha's deauthorization and other communications, indicating that he had received them and would respond. Khanukov to date has not responded to Alpha's demands nor turned over access to the Assets.

35.     Alpha wrote to Khanukov on June 11, 12, 14, and 16, 2023, by combination of email, Telegram messenger, and WhatsApp messenger to request that Khanukov return the Assets to Alpha, but Khanukov has not done so to date.

36.     To date, Khanukov holds the Assets which severely cripples Alpha's ability to do business. As an example, Alpha cannot operate its domain and email server, and effectively is unable to receive or send any emails.

37.     To date, Khanukov has refused to turn over to Alpha the software code repository for GoToCrowd, making it impossible for Alpha to maintain this key line of business.

38.     As a result of Khanukov's wrongful conduct, Alpha suffered and continues to suffer significant damages in lost income, inability to do its work, and resulting harm to its good will.

**FIRST CAUSE OF ACTION**
**Violation of the Defend Trade Secrets Act,**
**18 USC § 1836, *et seq.***
**(Alleged against Defendants)**

39.     Alpha repeats and re-alleges all of the previous allegations herein by reference.

40.     The Defend Trade Secrets Act ("DTSA"), 18 USC § 1836, *et seq*., gives owners of trade secrets a legal right to file a lawsuit in federal court when their trade secrets have been stolen or misappropriated. 18 USC § 1836(b)  "Trade secret" under the DTSA means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if (A) the owner thereof has taken reasonable measures to keep

such information secret and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. 18 USC § 1839(3).

41. Under the DTSA, "improper means" includes "breach of a duty to maintain secrecy". 18 USC § 1839(6).

42. Under the DTSA, "misappropriation" means "disclosure or use of a trade secret of another without express or implied consent by a person who … at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was **…** acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or **…** derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret. 18 USC § 1839(5).

43. Alpha takes reasonable measures to keep its trade secrets confidential and to protect against disclosure, among other ways by ensuring that consultants and other potential business partners sign non-disclosure agreements, confidentiality agreements, and confidential information and invention assignment agreements, as appropriate to the situation.

44. Alpha trade secrets are integral to Alpha's business. They comprise the source code for Alpha's lines of business, the technical aspects of Alpha's blockchain and cryptocurrency advisory business, and the nature of Alpha's relationships with key third party service providers that form a substantial part of the market value of Alpha's business consulting services. Disclosure of such trade secrets would have a material negative effect on Alpha's business as disclosure would allow competitors to provide a similar service at a lower cost or altogether replace Alpha's business offerings.

45. The CIIA imposed on Khanukov a duty not to disclose or use Alpha's trade secrets without permission. [CIIA Section 1.1]

46. Khanukov launched Go Global while in possession of Alpha's trade secrets after he entered into the CA and the CIIA on June 1, 2022.

47. Upon information and belief, Alpha further alleges that Khanukov used Alpha's confidential and proprietary information and trade secrets to develop a competing business in violation of his duties under the CIIA and in violation of the DTSA.

48.     As a result of Khanukov's prohibited use of Alpha's confidential and proprietary information and trade secrets, Alpha has been unable to control its websites, systems, code repositories, online personae, etc.

49.     As a direct and proximate result of Khanukov's usage of Alpha's confidential and proprietary information and trade secrets, Alpha has and continues to suffer damages in an amount according to proof at trial.

50.     Khanukov committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Alpha, and acted with an improper and evil motive amounting to malice and in conscious disregard of Alpha's rights.

51.     Because the acts taken towards Alpha were carried out by Khanukov acting in a despicable, deliberate, cold, callous, and intentional manner in order to injure and damage Alpha, Alpha is entitled to recover compensatory damages in an amount according to proof, as well as statutory penalties and punitive damages.

### SECOND CAUSE OF ACTION
### Violation of the State of California's Uniform Trade Secrets Act,
### Civil Code §§ 3426, *et seq.*
### (Alleged against Defendants)

52.     Alpha repeats and re-alleges all of the previous allegations herein by reference.

53.     The State of California's Uniform Trade Secrets Act ("UTSA"), Cal. Civil Code §§ 3426, *et seq.*, gives owners of trade secrets a legal right to file a lawsuit in state court when their trade secrets have been stolen or misappropriated. Information is a "trade secret" under the UTSA if it derives independent value from the fact it is unknown by others and a company has taken reasonable steps to protect the information from disclosure. Cal. Civil Code § 3426.1(d). A trade secret is misappropriated under the UTSA when it is acquired by a person who knows or has reason to know the trade secret was acquired by improper means, or when it is disclosed or used without consent by a person who: (1) used improper means to acquire knowledge of it; (2) knew or had reason to know that their knowledge of the information was derived through improper means, arose under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to maintain its secrecy or limit its use; or (3) before a material change of his or her position, knew or had reason to know the information was a trade secret and that knowledge of it had been acquired accidentally or by mistake. Cal. Civil Code § 3426.1(b)(2).

54. Alpha, through the nature of its business, maintains a wide variety of confidential and proprietary information and trade secrets, including but not limited to confidential employee data, customer data, customer lists, budgets, strategy, business and product development plans, contract and pricing terms, marketing materials, product information, designs, formulas, methods, developmental or experimental work, improvements, discoveries, inventions, ideas, plans for research and development, and other information concerning its actual or anticipated business activity. All of this information possessed great independent economic and commercial value to Alpha and effectively secured Alpha's ability to run its business.

55. Alpha maintained a standard practice to protect the above information from disclosure by keeping it accessible only to individuals who sign confidentiality agreements or Alpha's form CIIA.

56. Alpha alleges that Khanukov is withholding Alpha's confidential and proprietary information and trade secrets. In so doing, Khanukov effectively took all of Alpha's confidential and proprietary information and trade secrets for himself and his own benefit and thereafter denied Alpha access to that information and the ability to use it to conduct business.

57. Upon information and belief, Alpha further alleges that Khanukov used Alpha's confidential and proprietary information and trade secrets to develop a competing business in violation of his duties under the CIIA and in violation of the UTSA.

58. As a result of Khanukov's prohibited use of Alpha's confidential and proprietary information and trade secrets, Alpha has been unable to control its websites, systems, code repositories, online personae, etc.

59. As a direct and proximate result of Khanukov's usage of Alpha's confidential and proprietary information and trade secrets, Alpha has and continues to suffer damages in an amount according to proof at trial.

60. Khanukov committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Alpha, and acted with an improper and evil motive amounting to malice and in conscious disregard of Alpha's rights.

61. Because the acts taken towards Alpha were carried out by Khanukov acting in a despicable, deliberate, cold, callous, and intentional manner in order to injure and damage Alpha, Alpha is entitled to recover compensatory damages in an amount according to proof, as well as statutory penalties and punitive damages.

### THIRD CAUSE OF ACTION
### Violation of the State of California's Comprehensive Computer Data and Fraud Access Act, California Penal Code § 502
### (Alleged against Defendants)

62.     Alpha repeats and re-alleges all of the previous allegations herein by reference.

63.     The State of California's Comprehensive Computer Data Access and Fraud Act, California Penal Code § 502 ("CDAFA"), affords protection to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems.

64.     Khanukov was a consultant for Alpha. For its operations, Alpha maintained several websites, code repositories, and computer networks and systems for the purpose of running Alpha and its affiliated business lines, which included a database of electronically stored information including, among other things, customer lists and contact information, customer preferences, and passwords for company accounts; and several electronic communications systems including email systems, the Assets.

65.     In his consultant role as Director of Technology for Alpha, Khanukov had near unlimited access to Alpha's various systems. However, after Khanukov informed Alpha that he was no longer working for Alpha, Alpha instructed Khanukov to deliver complete and undamaged access to the Assets to Alpha . Despite his duty to perform as directed in light of his separation from Alpha, Khanukov has not delivered any access to any Assets or computer systems he managed for Alpha, thereby hijacking full and total control of Alpha's computer system and computer databases, locking Alpha and its personnel out of all such systems and preventing them from accessing it.

66.     Khanukov has continued to maintain full and total control of nearly all of Alpha's Assets to date. Alpha has had almost no access to its Assets to date.

67.     As a result, Khanukov has and continues to knowingly and without permission disrupt or cause the disruption of computer services or denied or caused the denial of computer services to Alpha, who is an authorized user of that computer, computer system, or computer network.

68.     Alpha suffered and continues to suffer damages as a result of Khanukov's violation of the CDAFA.

69.     Khanukov willfully violated the CDAFA in disregard and derogation of Alpha's rights. Khanukov's actions as alleged above were carried out with oppression, fraud, and malice.

70.     Pursuant to CDAFA, Alpha is entitled to injunctive relief, compensatory damages, punitive or exemplary damages, attorneys' fees, costs and other equitable relief.

### FOURTH CAUSE OF ACTION
### Violation of the Computer Fraud and Abuse Act,
### 18 USC 1030, *et seq.*
### (Alleged against Defendants)

71.     Alpha repeats and re-alleges all of the previous allegations herein by reference.

72.     The Computer Fraud and Abuse Act, Federal Penal Code 18 USC § 1030 ("CFAA"), affords protection to individuals, businesses, and governmental agencies from intentionally accessing a protected computer without authorization or by exceeding authorized access.

73.     Khanukov was a consultant for Alpha. For its operations, Alpha maintained several websites, code repositories, and computer networks and systems for the purpose of running Alpha and its affiliated business lines, which included a database of electronically stored information including, among other things, customer lists and contact information, customer preferences, and passwords for company accounts; and several electronic communications systems including email systems.

74.     In his consultant role as Director of Technology for Alpha, Khanukov had near unlimited access to Alpha's various systems. However, after Khanukov informed Alpha that he was no longer working for Alpha, Alpha instructed Khanukov to deliver complete and undamaged access to the information technology, computer, and network systems to Alpha . Despite his duty to perform as directed in light of his separation from Alpha, Khanukov has not delivered any access to any IT assets or computer systems he managed for Alpha, thereby hijacking full and total control of Alpha's computer system and computer databases, locking Alpha and its personnel out of all such systems and preventing them from accessing it.

75.     Khanukov has continued to maintain full and total control of nearly all of Alpha's computer, computer systems, computer networks, and other IT assets to date. Alpha has had zero access to its own computer, computer systems, computer networks, or other IT assets to date.

76.     As a result, Khanukov has and continues to knowingly and without permission disrupt or cause the disruption of computer services or denied or caused the denial of computer

services to Alpha, who is an authorized user of that computer, computer system, or computer network.

77.     Alpha suffered and continues to suffer damage as a result of Khanukov's violation of the CFAA.

78.     Khanukov willfully violated the CFAA in disregard and derogation of Alpha's rights. Khanukov's actions as alleged above were carried out with oppression, fraud, and malice.

79.     Pursuant to CFAA, Alpha is entitled to injunctive relief, compensatory damages, punitive or exemplary damages, attorneys' fees, costs and other equitable relief.

**FIFTH CAUSE OF ACTION**
**Breach of Contract**
**(Alleged against Defendants)**

80.     Alpha repeats and re-alleges all of the previous allegations herein by reference.

81.     Khanukov entered into the CA and the CIIA and agreed that Alpha's Confidential Information and Proprietary Information were at all times property of Alpha, and that upon termination of engagement Khanukov would return control over Alpha's Proprietary Information and Confidential Information back to Alpha.

82.     The CIIA and CA provide that Khanukov agreed that upon the termination of his engagement with Alpha, he would "deliver to Company any and all drawings, notes, memoranda, specifications, devices, formulas and documents, together with all copies thereof, and any other material containing or disclosing any Company Inventions, Third Party Information, or Confidential Information of [Alpha Capital]," (Section 8 of the CIIA), would "not copy, delete, or alter any information contained upon my Company computer or Company equipment before I return it to Company," (Section 8 of the CIAA), would "if [he has] used any personal computer, server, or email system to receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information...to provide Company with a computer-useable copy of all such Confidential Information and then permanently delete and expunge such Confidential Information from those systems; and...to provide Company access to the relevant portions of [his] system as reasonably requested to verify that the necessary copying and/or deletion is completed," (Section 8 of the CIIA), and would "provide to [Alpha] all items and copies containing or embodying Proprietary Information" (Section 2b of the CA).

83.     After terminating the Consulting Agreement, Khanukov refused to communicate with Alpha at all.

84.     Khanukov breached the CIIA and CA by engaging in the conduct described above, including, but not limited to, refusing to return Alpha's confidential information.

85.     As a result of Khanukov's breach of the CA and CIIA, Alpha has suffered damages in an amount to be proven at trial, examples of which are described above.

86.     In doing the acts herein alleged, Khanukov acted with oppression, fraud or malice, and in reckless or in willful disregard of Alpha's rights and Alpha is therefore entitled to punitive damages in an amount according to proof at the time of trial.

### SIXTH CAUSE OF ACTION
### Fraudulent Misrepresentation
### (Alleged against Defendants)

87.     Alpha repeats and re-alleges all of the previous allegations herein by reference.

88.     Alpha is informed and believes and thereon alleges that Khanukov fraudulently induced Alpha into entering into a consulting relationship with him and spending in excess of $300,000 of corporate funds as compensation to Khanukov.

89.     Khanukov misrepresented Alpha that he would provide professional services and keep Alpha's trade secrets confidential. However, within several months Khanukov began to misappropriate the Assets, and misappropriate Alpha's intellectual property to steal Alpha's business for himself individually.

90.     Alpha alleges that Khanukov's initial representations that he would enter into a mutually beneficial consulting relationship with Alpha were knowingly false and made with the intent to induce Alpha's reliance on them. Khanukov had no intention of starting a mutually beneficial consulting relationship with Alpha. Instead, he merely wanted to induce Alpha to spend money on development of IT assets that he could then use himself, and to pursue business opportunities that competed against Alpha's.

91.     Alpha reasonably and justifiably relied on Khanukov's misrepresentations.

92.     Alpha has been harmed by Khanukov's misrepresentations, as Khanukov has now carried out his plan of seizing the Assets, locking Alpha out of its computer systems, and using Alpha's intellectual property to develop a competing business. As such, Alpha has lost the benefit of its entire investment in the Assets as well as all revenue and future revenue that was redirected away from Alpha efforts to Khanukov's side project.

93.     As a direct and proximate result of Khanukov's conduct, Alpha has suffered actual and general damages in this respect in an amount to be proven at trial.

94.     In doing the acts herein alleged, Khanukov acted with oppression, fraud or malice, and in reckless or in willful disregard of Alpha's rights and Alpha is therefore entitled to punitive damages in an amount according to proof at the time of trial.

**SEVENTH CAUSE OF ACTION**
**Fraudulent Concealment**
**(Alleged against Defendants)**

95.     Alpha repeats and re-alleges all of the previous allegations herein by reference.

96.     Alpha is informed and believes and thereon alleges that Khanukov fraudulently concealed that he was competing with Alpha.

97.     Alpha alleges that Khanukov used his access to Alpha's novel technology for connecting investors with investment projects, GoToCrowd, to develop a competing project. Khanukov had no intention of dedicating his efforts to his duties with Alpha under the Consulting Agreement as he began his competing business mere months into his association with Alpha.

98.     Khanukov concealed his competing project from Alpha for several months and failed to explain the nature of Go Global when he initially disclosed the project in late January 2023. Per the CIIA, Khanukov was not permitted to engage in any side project without Alpha's express written approval. Alpha never approved Khanukov's side project. Yet Khanukov's LinkedIn profile indicates that he started Go Global, a competitor to GoToCrowd, in October 2022; he first informed Alpha of the Go Global name (but not its business or that Go Global competes with Alpha) several months later.

99.     Khanukov prevented Alpha from learning about his side project as he took measures to keep the project secret, including taking advantage of work from home opportunities, conducting conference calls from private offices rather than from his desk, etc.

100.    Alpha has been harmed by Khanukov's concealment, as Khanukov has now carried out his plan of using Alpha's intellectual property to develop a competing business. As such, Alpha has lost the benefit of its entire investment in the Assets as well as all revenue and future revenue that was redirected away from Alpha efforts to Khanukov's side project.

101.    As a direct and proximate result of Khanukov's conduct, Alpha has suffered actual and general damages in this respect in an amount to be proven at trial.

102.    In doing the acts herein alleged, Khanukov acted with oppression, fraud or malice, and in reckless or in willful disregard of Alpha's rights and Alpha is therefore entitled to punitive damages in an amount according to proof at the time of trial.

**EIGHTH CAUSE OF ACTION**
**Conversion**
**(Alleged against Defendants)**

103.    Alpha repeats and re-alleges all of the previous allegations herein by reference.

104.    A person is liable for the tort of conversion when they wrongfully exercise dominion over the property of another.

105.    Khanukov's conduct, as described above, constitutes conversion of Alpha's property.

106.    Khanukov misappropriated the IT Assets for his own purposes.

107.    Khanukov also took actions to prevent Alpha from doing business by refusing to deliver to Alpha access to its computer system, thereby taking its confidential and proprietary information and trade secrets described above.

108.    As a result of Khanukov's breach of duty, Alpha has suffered damages in an amount to be proven at trial, examples of which are described above.

109.    In doing the acts herein alleged, Khanukov acted with oppression, fraud or malice, and in reckless or in willful disregard of Alpha's rights and Alpha is therefore entitled to punitive damages in an amount according to proof at the time of trial.

**NINTH CAUSE OF ACTION**
**Negligence**
**(Alleged against Defendants)**

110.    Alpha repeats and re-alleges all of the previous allegations herein by reference.

111.    As former agent of Alpha Capital, Khanukov owed Alpha a general duty of care to act like a reasonably prudent person in all respects relating to Alpha.

112.    Khanukov breached the general duty of care he owed Alpha by engaging in the conduct described above.

113.    None of the above actions were made with the ordinary care or skill of a reasonably prudent person. Instead, Khanukov negligently engaged in this conduct to control Alpha's corporate activities to benefit himself in a manner detrimental to Alpha.

114.    As a result of Khanukov's breach of duty, Alpha has suffered damages in an amount to be proven at trial, examples of which are described above.

**TENTH CAUSE OF ACTION**
**Unlawful, Unfair, and Fraudulent Business Practices**
**in Violation of Bus. & Prof. Code §§ 17200 and 17203, *et. Seq.***
**(Alleged against Defendants)**

115.    Alpha repeats and re-alleges all of the previous allegations herein by reference.

116.    Bus. & Prof. Code § 17200, *et seq.* prohibits unfair competition in the form of any unlawful, unfair, or fraudulent business act or practice.

117.    Bus. & Prof. Code § 17201 provides: "Notwithstanding Section 2289 of the Civil Code, specific or preventative relief may be granted to enforce a penalty, forfeiture, or penal law in case of unfair competition."

118.    Bus. & Prof Code § 17203 provides that the court may restore to any person in interest any money or property which may have been acquired by means of such unfair competition.

119.    Bus. & Prof. Code § 17204 allows "any person who has suffered injury in fact and has lost money or property as a result of such unfair competition" to pursue a civil action for violation of the Unfair Business Practices Act.

120.    Labor Code § 90.5 states that it is the public policy of California to vigorously enforce minimum labor standards in order to ensure employees are not required to work under substandard and unlawful conditions, and to protect employers who comply with the law from employers who attempt to gain competitive advantage through circumvention of the law at the expense of their workers by failing to comply with minimum workplace standards and laws.

121.    Beginning at an exact date unknown to Alpha, but at least eight months prior to filing this suit, Defendant committed acts of unfair competition as defined by the Bus. & Prof. Code by engaging in the unlawful, unfair, and fraudulent acts and practices described herein, violating statutes including but not limited to the following:

        a.      Violations of the DSTA as described above.

        b.      Violations of the USTA as described above.

        c.      Violations of the CCDFA as described above.

        d.      Violations of the CFAA as described above.

122.    The violation of the above laws and regulations serve as unlawful predicate acts and practices for purposes of the Bus. & Prof. Code.

123.    The acts and practices described above have allowed Defendant to gain an unfair competitive advantage over Alpha.

124.    Accordingly, the acts and practices described above constitute unfair, unlawful, and fraudulent business practices within the meaning of the Bus. & Prof. Code.

125.   As a direct and proximate result of the acts described herein, Alpha has lost money or property in amount according to proof at trial.

126.   Alpha is thereby entitled to restitution pursuant to Bus. & Prof. Code § 17203 for all lost money or property during the 8-month period prior to the filing of this Complaint.

### JURY DEMAND

127.   Alpha hereby demands a trial by jury in this action.

### PRAYER FOR RELIEF

Wherefore, Alpha prays for the following relief:

1.   Actual damages and/or restitution;

2.   General damages;

3.   Punitive damages;

4.   Statutory damages and penalties;

5.   Injunctive and declaratory relief;

6.   Reasonable attorneys' fees as permitted by law;

7.   Costs of the suit incurred herein as permitted by law; and

8.   All other further relief as this Court deems just and proper.

Dated: July 7, 2023                    PERETZ & ASSOCIATES

By: _____

Yosef Peretz
David Garibaldi
Attorneys for Plaintiff
ALPHA CAPITAL LLC

# EXHIBIT 1

## CONSULTING AGREEMENT

Effective June 1, 2022, Dmitry Khanukov, an unincorporated individual ("Consultant") and Alpha Capital, LLC ("Company") agree as follows:

1.      Services; Payment; No Violation of Rights or Obligations.   Consultant agrees to undertake and complete the Services (as defined in Exhibit A) in accordance with and on the schedule specified in Exhibit A. As the only consideration due Consultant regarding the subject matter of this Agreement, Company will pay Consultant as (and only as) expressly stated in Exhibit A. Unless otherwise specifically agreed upon by Company in writing (and notwithstanding any other provision of this Agreement), all activity relating to Services will be performed by and only by Consultant. Consultant agrees that it will not (and will not permit others to) violate any agreement with or rights of any third party or, except as expressly authorized by Company in writing hereafter, use or disclose at any time Consultant's own or any third party's confidential information or intellectual property in connection with the Services or otherwise for or on behalf of Company.

2.      Ownership; Rights; Proprietary Information; Publicity.

a.      Company shall own all right, title and interest (including patent rights, copyrights, trade secret rights, mask work rights, trademark rights, *sui generis* database rights and all other intellectual property rights of any sort throughout the world) relating to any and all inventions (whether or not patentable), works of authorship, mask works, designations, designs, know-how, ideas and information made or conceived or reduced to practice, in whole or in part, by or for or on behalf of Consultant during the term of this Agreement that relate to the subject matter of or arise out of or in connection with the Services or any Proprietary Information (as defined below) (collectively, "Inventions") and Consultant will promptly disclose and provide all Inventions to Company. Consultant hereby makes all assignments necessary to accomplish the foregoing ownership; provided that no assignment is made that extends beyond what would be allowed under applicable law if Consultant were an employee of Company. Consultant shall assist Company, at Company's expense, to further evidence, record and perfect such assignments, and to perfect, obtain, maintain, enforce and defend any rights assigned. Consultant hereby irrevocably designates and appoints Company as its agent and attorney-in-fact, coupled with an interest, to act for and on Consultant's behalf to execute and file any document and to do all other lawfully permitted acts to further the foregoing with the same legal force and effect as if executed by Consultant and all other creators or owners of the applicable Invention.

b.      Consultant agrees that all Inventions and all other business, technical and financial information (including, without limitation, the identity of and information relating to customers or employees) developed, learned or obtained by or for or on behalf of Consultant during the period that Consultant is to be providing the Services that relate to Company or the business or demonstrably anticipated business of Company or in connection with the Services, or that are received by or for Company in confidence, constitute "Proprietary Information." Consultant shall hold in confidence and not disclose or, except in performing the Services, use any Proprietary Information. However, Consultant shall not be obligated under this paragraph with respect to information Consultant can document is or becomes readily publicly

available without restriction through no fault of Consultant.  Upon termination or as otherwise requested by Company, Consultant will promptly provide to Company all items and copies containing or embodying Proprietary Information, except that Consultant may keep its personal copies of its compensation records and this Agreement.  Consultant also recognizes and agrees that Consultant has no expectation of privacy with respect to Company's telecommunications, networking or information processing systems (including, without limitation, stored computer files, email messages and voice messages) and that Consultant's activity, and any files or messages, on or using any of those systems may be monitored at any time without notice.

           c.     As additional protection for Proprietary Information, Consultant agrees that during the period over which it is to be providing the Services (i) and for one year thereafter, Consultant will not directly or indirectly encourage or solicit any employee or consultant of Company to leave Company for any reason and (ii) Consultant will not engage in any activity that is in any way competitive with the business or demonstrably anticipated business of Company, and Consultant will not assist any other person or organization in competing or in preparing to compete with any business or demonstrably anticipated business of Company.  Without limiting the foregoing, Consultant may perform services for other persons, provided that such services do not represent a conflict of interest or a breach of Consultant's obligation under this Agreement or otherwise.

           d.     To the extent allowed by law, Section 2.a and any license granted Company hereunder includes all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like.  Furthermore, Consultant agrees that notwithstanding any rights of publicity, privacy or otherwise (whether or not statutory) anywhere in the world, and without any further compensation, Company may and is hereby authorized to (and to allow others to) use Consultant's name in connection with promotion of its business, products or services.  To the extent any of the foregoing is ineffective under applicable law, Consultant hereby provides any and all ratifications and consents necessary to accomplish the purposes of the foregoing to the extent possible.  Consultant will confirm any such ratifications and consents from time to time as requested by Company.  If any other person is in any way involved in any Services, Consultant will obtain the foregoing ratifications, consents and authorizations from such person for Company's exclusive benefit.

           e.     If any part of the Services or Inventions or information provided hereunder is based on, incorporates, or is an improvement or derivative of, or cannot be reasonably and fully made, used, reproduced, distributed and otherwise exploited without using or violating technology or intellectual property rights owned by or licensed to Consultant (or any person involved in the Services) and not assigned hereunder, Consultant hereby grants Company and its successors a perpetual, irrevocable, worldwide royalty-free, non-exclusive, sublicensable right and license to exploit and exercise all such technology and intellectual property rights in support of Company's exercise or exploitation of the Services, Inventions, other work or information performed or provided hereunder, or any assigned rights (including any modifications, improvements and derivatives of any of them).

           3.     Warranties and Other Obligations.  Consultant represents, warrants and covenants that: (i) the Services will be performed in a professional and workmanlike manner and

that none of such Services nor any part of this Agreement is or will be inconsistent with any obligation Consultant may have to others; (ii) all work under this Agreement shall be Consultant's original work and none of the Services or Inventions nor any development, use, production, distribution or exploitation thereof will infringe, misappropriate or violate any intellectual property or other right of any person or entity (including, without limitation, Consultant); (iii) Consultant has the full right to provide Company with the assignments and rights provided for herein (and has written enforceable agreements with all persons necessary to give it the rights to do the foregoing and otherwise fully perform this Agreement); (iv) Consultant shall comply with all applicable laws and Company safety rules in the course of performing the Services; and (v) if Consultant's work requires a license, Consultant has obtained that license and the license is in full force and effect.

4.      <u>Termination</u>.  This Agreement shall automatically terminate after three months, unless both parties agree in writing to extend the term of this Agreement. If either party breaches a material provision of this Agreement, the other party may terminate this Agreement upon ten (10) days' notice, unless the breach is cured within the notice period.  Company also may terminate this Agreement at any time, with or without cause, at any time. Company shall upon such termination pay Consultant all unpaid, undisputed amounts due for the Services completed prior to notice of such termination.  Sections 2 (subject to the limitations set forth in Section 2.c) through 9 of this Agreement and any remedies for breach of this Agreement shall survive any termination or expiration.  Company may communicate the obligations contained in this Agreement to any other (or potential) client or employer of Consultant.

5.      <u>Relationship of the Parties; Independent Contractor; No Employee Benefits</u>. Notwithstanding any provision hereof, Consultant is an independent contractor and is not an employee, agent, partner or joint venturer of Company and shall not bind nor attempt to bind Company to any contract. Consultant shall accept any directions issued by Company pertaining to the goals to be attained and the results to be achieved by Consultant, but Consultant shall be solely responsible for the manner and hours in which the Services are performed under this Agreement. Consultant shall not be eligible to participate in any of Company's employee benefit plans, fringe benefit programs, group insurance arrangements or similar programs.  Company shall not provide workers' compensation, disability insurance, Social Security or unemployment compensation coverage or any other statutory benefit to Consultant. Consultant shall comply at Consultant's expense with all applicable provisions of workers' compensation laws, unemployment compensation laws, federal Social Security law, the Fair Labor Standards Act, federal, state and local income tax laws, and all other applicable federal, state and local laws, regulations and codes relating to terms and conditions of employment required to be fulfilled by employers or independent contractors. Consultant will ensure that its employees, contractors and others involved in the Services, if any, are bound in writing to the foregoing, and to all of Consultant's obligations under any provision of this Agreement, for Company's benefit and Consultant will be responsible for any noncompliance by them.  Consultant agrees to indemnify Company from any and all claims, damages, liability, settlement, attorneys' fees and expenses, as incurred, on account of the foregoing or any breach of this Agreement or any other action or inaction by or for or on behalf of Consultant.

6.      <u>Assignment</u>. This Agreement and the services contemplated hereunder are personal to Consultant and Consultant shall not have the right or ability to assign, transfer or

subcontract any rights or obligations under this Agreement without the written consent of Company. Any attempt to do so shall be void. Company may fully assign and transfer this Agreement in whole or part.

7.    Notice. All notices under this Agreement shall be in writing and shall be deemed given when personally delivered, or three days after being sent by prepaid certified or registered U.S. mail to the address of the party to be noticed as set forth herein or to such other address as such party last provided to the other by written notice.

8.    Miscellaneous. Any breach of Section 2 or 3 will cause irreparable harm to Company for which damages would not be an adequate remedy, and therefore, Company will be entitled to injunctive relief with respect thereto in addition to any other remedies. The failure of either party to enforce its rights under this Agreement at any time for any period shall not be construed as a waiver of such rights. No changes, additions, modifications or waivers to this Agreement will be effective unless in writing and signed by both parties. In the event that any provision of this Agreement shall be determined to be illegal or unenforceable, that provision will be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable. This Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to the conflicts of laws provisions thereof. In any action or proceeding to enforce rights under this Agreement, the prevailing party will be entitled to recover costs and attorneys' fees. Headings herein are for convenience of reference only and shall in no way affect interpretation of the Agreement. This Agreement represents the entire understanding and agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements between the parties with respect to the subject matter hereof.

9.    Arbitration. Any controversy or claim (except those regarding Inventions, Proprietary Information or intellectual property) arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof, provided however, that each party will have a right to seek injunctive or other equitable relief in a court of law. The prevailing party will be entitled to receive from the non-prevailing party all costs, damages and expenses, including reasonable attorneys' fees, incurred by the prevailing party in connection with that action or proceeding, whether or not the controversy is reduced to judgment or award. The prevailing party will be that party who may be fairly said by the arbitrator(s) to have prevailed on the major disputed issues. Consultant hereby consents to the arbitration in the State of California in the county of San Diego.

NOTICE: This agreement does not affect any immunity under 18 USC Sections 1833(b) (1) or (2), which read as follows (note that for purposes of this statute only, individuals performing work as contractors or consultants are considered to be employees):

(1) An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or

investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

(2)  An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual (A) files any document containing the trade secret under seal; and (B) does not disclose the trade secret, except pursuant to court order.

_____
Dmitry Khanukov, Consultant

ALPHA CAPITAL, LLC
(Company)

By_____
Colin Breeze, CEO

251  174th St, apt 1009
Sunny Isles Beach, Fl, 33160

PO Box 222

Rancho Santa Fe, CA 92067

5

## EXHIBIT A

**SERVICES** The services are as follows (and also include any other work consultant performs for company or related to the Company's actual or proposed business, research or development):

- Director of Technology of Alpha Capital, LLC
- Setting a vision for how technology will be used in the company.
- Ensuring that technological resources meet the company's short and long-term needs.
- Outline the goals for research and development.
- Creating timelines for the development and deployment of all technological services.
- Making executive decisions on behalf of the company's technological requirements.
- Acting as a mentor to team members.
- Maintaining a consumer-focused outlook and aiding in the delivery of IT projects to market.
- Managing technology budgets and time frames.
- Staying on top of technology trends and developments.
- Ensuring all technology practices adhere to regulatory standards.

**FEES/EXPENSES** (APPLICABLE ONLY WHERE CHECKED AND COMPLETED)

_X_ Monthly compensation of $10,000.00 for Services rendered, payable semi-monthly (2x per month) in arrears (provided that Company may, at any time and without the obligation to compensate Consultant, withdraw requests for Services).

_X_ EXPENSE REIMBURSEMENT (EVEN IF THIS ITEM IS CHECKED, AND THEREFORE APPLICABLE, REIMBURSEMENT IS (1) LIMITED TO REQUIRED, REASONABLE TELEPHONE EXPENSES AND TRAVEL (TRANSPORTATION, LODGING AND MEALS) AUTHORIZED IN WRITING BY COMPANY IN ADVANCE, AND (2) PAYABLE WITHIN 7 DAYS AFTER ITEMIZED INVOICE AND DELIVERY OF RECEIPTS.

**EXHIBIT 2**

## CONFIDENTIAL INFORMATION AND INVENTIONS ASSIGNMENT AGREEMENT

In consideration of my engagement or continued engagement by or affiliation or association with **ALPHA CAPITAL, LLC**, its subsidiaries, parents, affiliates, successors and assigns (together "*Company*"), and the compensation paid to me now and during my engagement or affiliation or association with Company, I hereby enter into this Confidential Information and Invention Assignment Agreement (the "*Agreement*") and agree as follows:

1. **CONFIDENTIAL INFORMATION PROTECTIONS.**

   **1.1     Recognition of Company's Rights; Nondisclosure.**   I understand and acknowledge that my engagement by Company creates a relationship of confidence and trust with respect to Company's Confidential Information (as defined below) and that Company has a protectable interest therein. At all times during and after my engagement, I will hold in confidence and will not disclose, use, lecture upon, or publish any of Company's Confidential Information, except as such disclosure, use or publication may be required in connection with my work for Company, or unless a second officer of Company expressly authorizes such disclosure. I will obtain Company's written approval before publishing or submitting for publication any material (written, oral, or otherwise) that discloses and/or incorporates any Confidential Information. I hereby assign to Company any rights I may have or acquire in such Confidential Information and recognize that all Confidential Information will be the sole and exclusive property of Company and its assigns. I will take all reasonable precautions to prevent the inadvertent accidental disclosure of Confidential Information. Notwithstanding the foregoing, pursuant to 18 U.S.C. Section 1833(b), I will not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that: (1) is made in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (2) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

   **1.2     Confidential Information.**   The term "*Confidential Information*" means any and all confidential knowledge, data or information of Company. By way of illustration but not limitation, "*Confidential Information*" includes (a) trade secrets, inventions, mask works, ideas, processes, formulas, software in source or object code, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques and any other proprietary technology and all Intellectual Property Rights (as defined below) therein (collectively, "*Inventions*"); (b) information regarding research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, margins, discounts, credit terms, pricing and billing policies, quoting procedures, methods of obtaining business, forecasts, future plans and potential strategies, financial projections and business strategies, operational plans, financing and capital-raising plans, activities and agreements, internal services and operational manuals, methods of conducting Company business, suppliers and supplier information, and purchasing; (c) information regarding customers and potential customers of Company, including customer lists, names, representatives, their needs or desires with respect to the types of products or services offered by Company, proposals, bids, contracts and their contents and parties, the type and quantity of products and services provided or sought to be provided to customers and potential customers of Company and other non-public information relating to customers and potential customers; (d) information regarding any of Company's business partners and their services, including names, representatives, proposals, bids, contracts and their contents and parties, the type and quantity of products and services received by Company, and other non-public information relating to business partners; (e) information regarding personnel, employee lists, compensation, and employee skills; and (f) any other non-public information which a competitor of Company could use to the competitive disadvantage of Company. Notwithstanding the foregoing, it is understood that, at all such times, I am free to use information which was known to me prior to my engagement with Company or which is generally known in the trade or industry through no breach of this Agreement or other act or omission by me. Notwithstanding the foregoing or anything to the contrary in this Agreement or any other agreement between the Company and me, nothing in this Agreement will limit my right to discuss my engagement or report possible violations of law or regulation with the Equal Employment Opportunity Commission, United States Department of Labor, the National Labor Relations Board, the Securities and Exchange Commission, or other federal government agency or similar state or local agency or to discuss the terms and conditions of my engagement with others to the extent expressly permitted by Section 7 of the National Labor Relations Act or to the extent that such disclosure is protected under the applicable provisions of law or regulation, including but not limited to "whistleblower" statutes or other similar provisions that protect such disclosure.

   **1.3     Third Party Information.**   I understand, in addition, that Company has received and in the future will receive from third parties their confidential and/or proprietary knowledge, data or information (**"*Third Party Information*"**) subject to a duty on Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. During the term of my engagement and thereafter, I will hold Third Party Information in confidence and will not disclose to anyone (other than Company personnel who need to know such information in connection with their work for Company) or use, except in connection with my work for Company, Third Party Information or unless expressly authorized by an officer of Company in writing.

   **1.4     Term of Nondisclosure Restrictions.**   I understand that Confidential Information and Third Party Information is

never to be used or disclosed by me, as provided in this Section 1. If a temporal limitation on my obligation not to use or disclose such information is required under applicable law, and the Agreement or its restriction(s) cannot otherwise be enforced, I agree and Company agrees that the two year period after the date my engagement ends will be the temporal limitation relevant to the contested restriction; *provided, however,* that this sentence will not apply to trade secrets protected without temporal limitation under applicable law.

**1.5 No Improper Use of Information of Prior Employers and Others**. During my engagement by Company, I will not improperly use or disclose confidential information or trade secrets, if any, of any former employer or any other person to whom I have an obligation of confidentiality, and I will not bring onto the premises of Company any unpublished documents or any property belonging to any former employer or any other person to whom I have an obligation of confidentiality unless consented to in writing by that former employer or person.

**2.    ASSIGNMENTS OF INVENTIONS.**

**2.1 Definitions**. As used in this Agreement, the term "*Intellectual Property Rights*" means all trade secrets, Copyrights, trademarks, mask work rights, patents and other intellectual property rights recognized by the laws of any jurisdiction or country; the term "*Copyright*" means the exclusive legal right to reproduce, perform, display, distribute and make derivative works of a work of authorship (as a literary, musical, or artistic work) recognized by the laws of any jurisdiction or country; and the term "*Moral Rights*" means all paternity, integrity, disclosure, withdrawal, special and any other similar rights recognized by the laws of any jurisdiction or country.

**2.2 Excluded Inventions and Other Inventions**. Attached hereto as **Exhibit A** is a list describing all existing Inventions, if any, (a) that are owned by me or in which I have an interest and were made or acquired by me prior to my date of first engagement by Company, (b) that may relate to Company's business or actual or demonstrably anticipated research or development, and (c) that are not to be assigned to Company ("*Excluded Inventions*"). If no such list is attached, I represent and agree that it is because I have no Excluded Inventions. For purposes of this Agreement, "*Other Inventions*" means Inventions in which I have or may have an interest, as of the commencement of my engagement or thereafter, other than Company Inventions (as defined below) and Excluded Inventions. I acknowledge and agree that if I use any Excluded Inventions or any Other Inventions in the scope of my engagement, or if I include any Excluded Inventions or Other Inventions in any product or service of Company, or if my rights in any Excluded Inventions or Other Inventions may block or interfere with, or may otherwise be required for, the exercise by Company of any rights assigned to Company under this Agreement, I will immediately so notify Company in writing. Unless Company and I agree otherwise in writing as to particular Excluded Inventions or Other Inventions, I hereby grant to Company, in such circumstances (whether or not I give

Company notice as required above), a non-exclusive, perpetual, transferable, fully-paid and royalty-free, irrevocable and worldwide license, with rights to sublicense through multiple levels of sublicensees, to reproduce, make derivative works of, distribute, publicly perform, and publicly display in any form or medium, whether now known or later developed, make, have made, use, sell, import, offer for sale, and exercise any and all present or future rights in, such Excluded Inventions and Other Inventions. To the extent that any third parties have rights in any such Other Inventions, I hereby represent and warrant that such third party or parties have validly and irrevocably granted to me the right to grant the license stated above.

**2.3 Assignment of Company Inventions**. Inventions assigned to Company or to a third party as directed by Company pursuant to Section 2.6 are referred to in this Agreement as "*Company Inventions*." Subject to Section 2.4 and except for Excluded Inventions set forth in **Exhibit A** and Other Inventions, I hereby assign to Company all my right, title, and interest in and to any and all Inventions (and all Intellectual Property Rights with respect thereto) made, conceived, reduced to practice, or learned by me, either alone or with others, during the period of my engagement by Company.    To the extent required by applicable Copyright laws, I agree to assign in the future (when any copyrightable Inventions are first fixed in a tangible medium of expression) my Copyright rights in and to such Inventions. Any assignment of Company Inventions (and all Intellectual Property Rights with respect thereto) hereunder includes an assignment of all Moral Rights. To the extent such Moral Rights cannot be assigned to Company and to the extent the following is allowed by the laws in any country where Moral Rights exist, I hereby unconditionally and irrevocably waive the enforcement of such Moral Rights, and all claims and causes of action of any kind against Company or related to Company's customers, with respect to such rights. I further acknowledge and agree that neither my successors-in-interest nor legal heirs retain any Moral Rights in any Company Inventions (and any Intellectual Property Rights with respect thereto).

**2.4    Unassigned or Nonassignable Inventions**. I recognize that this Agreement will not be deemed to require assignment of any Invention that is covered under California Labor Code section 2870(a) (the "*Specific Inventions Law*") except for those Inventions that are covered by a contract between Company and the United States or any of its agencies that require full title to such patent or Invention to be in the United States.

**2.5    Obligation to Keep Company Informed**. During the period of my engagement, I will promptly and fully disclose to Company in writing all Inventions authored, conceived, or reduced to practice by me, either alone or jointly with others. At the time of each such disclosure, I will advise Company in writing of any Inventions that I believe fully qualify for protection under the provisions of the Specific Inventions Law; and I will at that time provide to Company in writing all evidence necessary to substantiate that belief. Company will

keep in confidence and will not use for any purpose or disclose to third parties without my consent any confidential information disclosed in writing to Company pursuant to this Agreement relating to Inventions that qualify fully for protection under the Specific Inventions Law. I will preserve the confidentiality of any Invention that does not fully qualify for protection under the Specific Inventions Law.

**2.6 Government or Third Party.** I agree that, as directed by Company, I will assign to a third party, including without limitation the United States, all my right, title, and interest in and to any particular Company Invention.

**2.7 Ownership of Work Product.**

(a) I acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of my engagement and which are protectable by Copyright are "works made for hire," pursuant to United States Copyright Act (17 U.S.C., Section 101).

(b) I agree that Company will exclusively own all work product that is made by me (solely or jointly with others) within the scope of my engagement, and I hereby irrevocably and unconditionally assign to Company all right, title, and interest worldwide in and to such work product. I understand and agree that I have no right to publish on, submit for publishing, or use for any publication any work product protected by this Section, except as necessary to perform services for Company.

**2.8 Enforcement of Intellectual Property Rights and Assistance.** I will assist Company in every proper way to obtain, and from time to time enforce, United States and foreign Intellectual Property Rights and Moral Rights relating to Company Inventions in any and all countries. To that end I will execute, verify and deliver such documents and perform such other acts (including appearances as a witness) as Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such Intellectual Property Rights and the assignment thereof. In addition, I will execute, verify and deliver assignments of such Intellectual Property Rights to Company or its designee, including the United States or any third party designated by Company. My obligation to assist Company with respect to Intellectual Property Rights relating to such Company Inventions in any and all countries will continue beyond the termination of my engagement, but Company will compensate me at a reasonable rate after my termination for the time actually spent by me at Company's request on such assistance. In the event Company is unable for any reason, after reasonable effort, to secure my signature on any document needed in connection with the actions specified in this paragraph, I hereby irrevocably designate and appoint Company and its duly authorized officers and agents as my agent and attorney in fact, which appointment is coupled with an interest, to act for and on my behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of the preceding paragraph with the same legal force and effect as if executed by me. I hereby waive and quitclaim to Company any and all claims, of any nature whatsoever, which I now or may hereafter have for infringement of any Intellectual Property Rights assigned under this Agreement to Company.

**2.9 Incorporation of Software Code.** I agree that I will not incorporate into any Company software or otherwise deliver to Company any software code licensed under the GNU General Public License or Lesser General Public License or any other license that, by its terms, requires or conditions the use or distribution of such code on the disclosure, licensing, or distribution of any source code owned or licensed by Company **except** in strict compliance with Company's policies regarding the use of such software.

**3. RECORDS.** I agree to keep and maintain adequate and current records (in the form of notes, sketches, drawings and in any other form that is required by Company) of all Confidential Information developed by me and all Company Inventions made by me during the period of my engagement at Company, which records will be available to and remain the sole property of Company at all times.

**4. DUTY OF LOYALTY DURING ENGAGEMENT.** I agree that during the period of my engagement by Company, I will not, without Company's express written consent, directly or indirectly engage in any engagement or business activity which is directly or indirectly competitive with, or would otherwise conflict with, my engagement by Company.

**5. NO SOLICITATION OF EMPLOYEES, CONSULTANTS OR CONTRACTORS.** I agree that during the period of my engagement and for the one year period after the date my engagement ends for any reason, including but not limited to voluntary termination by me or involuntary termination by Company, I will not, as an officer, director, employee, consultant, owner, partner, or in any other capacity, either directly or through others, except on behalf of Company, solicit, induce, encourage, or participate in soliciting, inducing or encouraging any person known to me to be an employee, consultant, or independent contractor of Company to terminate his or her relationship with Company, even if I did not initiate the discussion or seek out the contact.

**6. REASONABLENESS OF RESTRICTIONS.**

**6.1** I agree that I have read this entire Agreement and understand it. I agree that this Agreement does not prevent me from earning a living or pursuing my career. I agree that the restrictions contained in this Agreement are reasonable, proper, and necessitated by Company's legitimate business interests. I represent and agree that I am entering into this Agreement freely and with knowledge of its contents with the intent to be bound by the Agreement and the restrictions contained in it.

**6.2** In the event that a court finds this Agreement, or any of its restrictions, to be ambiguous, unenforceable, or invalid, I and Company agree that the court will read the

Agreement as a whole and interpret the restriction(s) at issue to be enforceable and valid to the maximum extent allowed by law.

**6.3** If the court declines to enforce this Agreement in the manner provided in subsection 6.2, Company and I agree that this Agreement will be automatically modified to provide Company with the maximum protection of its business interests allowed by law and I agree to be bound by this Agreement as modified.

**7. NO CONFLICTING AGREEMENT OR OBLIGATION.** I represent that my performance of all the terms of this Agreement and as a Service Provider of Company does not and will not breach any agreement to keep in confidence information acquired by me in confidence or in trust prior to my engagement by Company. I have not entered into, and I agree I will not enter into, any agreement either written or oral in conflict with this Agreement.

**8. RETURN OF COMPANY PROPERTY.** When I leave the employ of Company, I will deliver to Company any and all drawings, notes, memoranda, specifications, devices, formulas and documents, together with all copies thereof, and any other material containing or disclosing any Company Inventions, Third Party Information or Confidential Information of Company. I agree that I will not copy, delete, or alter any information contained upon my Company computer or Company equipment before I return it to Company. In addition, if I have used any personal computer, server, or e-mail system to receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, I agree to provide Company with a computer-useable copy of all such Confidential Information and then permanently delete and expunge such Confidential Information from those systems; and I agree to provide Company access to the relevant portions of my system as reasonably requested to verify that the necessary copying and/or deletion is completed. I further agree that any property situated on Company's premises and owned by Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company's personnel at any time with or without notice. Prior to leaving, I will cooperate with Company in attending an exit interview and completing and signing Company's termination statement if required to do so by Company.

**9. LEGAL AND EQUITABLE REMEDIES.**

**9.1** I agree that it may be impossible to assess the damages caused by my violation of this Agreement or any of its terms. I agree that any threatened or actual violation of this Agreement or any of its terms will constitute immediate and irreparable injury to Company, and Company will have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that Company may have for a breach or threatened breach of this Agreement.

**9.2** In the event Company enforces this Agreement through a court order, I agree that the restrictions of Section 5 will remain in effect for a period of 12 months from the effective date of the Order enforcing the Agreement.

**10. NOTICES.** Any notices required or permitted under this Agreement will be given to Company at its headquarters location at the time notice is given, labeled "Attention Chief Executive Officer," and to me at my address as listed on Company payroll, or at such other address as Company or I may designate by written notice to the other. Notice will be effective upon receipt or refusal of delivery. If delivered by certified or registered mail, notice will be considered to have been given five business days after it was mailed, as evidenced by the postmark. If delivered by courier or express mail service, notice will be considered to have been given on the delivery date reflected by the courier or express mail service receipt.

**11. PUBLICATION OF THIS AGREEMENT TO SUBSEQUENT EMPLOYER OR BUSINESS ASSOCIATES OF SERVICE PROVIDER.**

**11.1** If I am offered employment or the opportunity to enter into any business venture as owner, partner, consultant or other capacity while the restrictions described in Section 5 of this Agreement are in effect I agree to inform my potential employer, partner, co-owner and/or others involved in managing the business with which I have an opportunity to be associated of my obligations under this Agreement and also agree to provide such person or persons with a copy of this Agreement.

**11.2** I agree to inform Company of all employment and business ventures which I enter into while the restrictions described in Section 5 of this Agreement are in effect and I also authorize Company to provide copies of this Agreement to my employer, partner, co-owner and/or others involved in managing the business with which I am employed or associated and to make such persons aware of my obligations under this Agreement.

**12. GENERAL PROVISIONS.**

**12.1 Governing Law; Consent to Personal Jurisdiction.** This Agreement will be governed by and construed according to the laws of the State of California as such laws are applied to agreements entered into and to be performed entirely within California between residents of California. I hereby expressly consent to the personal jurisdiction and venue of the state and federal courts located in California for any lawsuit filed there against me by Company arising from or related to this Agreement.

**12.2 Severability.** In case any one or more of the provisions, subsections, or sentences contained in this Agreement will, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect the other provisions of this Agreement, and this Agreement will be construed as if such invalid, illegal or unenforceable provision had never been

contained in this Agreement. If moreover, any one or more of the provisions contained in this Agreement will for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it will be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it will then appear.

**12.3 Successors and Assigns**. This Agreement is for my benefit and the benefit of Company, its successors, assigns, parent corporations, subsidiaries, affiliates, and purchasers, and will be binding upon my heirs, executors, administrators and other legal representatives.

**12.4 Survival**. This Agreement will survive the termination of my engagement, regardless of the reason, and the assignment of this Agreement by Company to any successor in interest or other assignee.

**12.5 Engagement At-Will**. I agree and understand that nothing in this Agreement will change my at-will engagement status or confer any right with respect to continuation of engagement by Company, nor will it interfere in any way with my right or Company's right to terminate my engagement at any time, with or without cause or advance notice.

**12.6 Waiver**. No waiver by Company of any breach of this Agreement will be a waiver of any preceding or succeeding breach. No waiver by Company of any right under this Agreement will be construed as a waiver of any other right. Company will not be required to give notice to enforce strict adherence to all terms of this Agreement.

**12.7 Export**. I agree not to export, reexport, or transfer, directly or indirectly, any U.S. technical data acquired from Company or any products utilizing such data, in violation of the United States export laws or regulations.

**12.8 Counterparts**. This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act or other applicable law) or other transmission method and any counterpart so delivered will be deemed to have been duly and validly delivered and be valid and effective for all purposes.

**12.9 Advice of Counsel**. **I ACKNOWLEDGE THAT, IN EXECUTING THIS AGREEMENT, I HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND I HAVE READ AND UNDERSTOOD ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT. THIS AGREEMENT WILL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION OF THIS AGREEMENT.**

**12.10    Entire Agreement**. The obligations pursuant to Sections 1 and 2 (except Subsection 2.4 and Subsection 2.7(a)) of this Agreement will apply to any time during which I was previously engaged, or am in the future engaged, by Company as a consultant if no other agreement governs nondisclosure and assignment of inventions during such period. This Agreement is the final, complete and exclusive agreement of the parties with respect to the subject matter of this Agreement and supersedes and merges all prior discussions between us. No modification of or amendment to this Agreement will be effective unless in writing and signed by the party to be charged. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

[Signatures to follow on next page]

This Agreement will be effective as of June ___, 2022.

**SERVICE PROVIDER:**

**I HAVE READ, UNDERSTAND, AND ACCEPT THIS AGREEMENT AND HAVE BEEN GIVEN THE OPPORTUNITY TO REVIEW IT WITH INDEPENDENT LEGAL COUNSEL.**

_____
(Signature)

_____Dmitry    Khanukov_____
Name

_____05/ 24 / 2022_____
Date

Address: 251  174th st. , 1009
Sunny Isles Beach, Fl, 33160

**COMPANY:**

**ACCEPTED AND AGREED**

**ALPHA CAPITAL, LLC**

By: _____

Name:    Colin Breeze
Title:    Chief Executive Officer

Address:    PO Box 222
Rancho Santa Fe, CA 92067

**EXHIBIT A**

**EXCLUDED INVENTIONS**

| | |
|---|---|
| **TO:** | ALPHA CAPITAL, LLC |
| **FROM:** | Dmitry Khanukov |
| **DATE:** | 05/24/2022 |

**1.** **Excluded Inventions Disclosure**. Except as listed in Section 2 below, the following is a complete list of all Excluded Inventions:

☐ No Excluded Inventions.

☑ See below:

Octopus Project (crypto/stock market analitical platform)
Telik (platform for stream shopping and etc.)
Galateo (virtual influencers for metaverse and social media)
Patent : RU 2 736 629 C1
Prestige Cars (car manufacturing, tuning, repair and sales)
13 services (real-estate, cleaning, car rental, and etc)

☐ Additional sheets attached.

**2.** Due to a prior confidentiality agreement, I cannot complete the disclosure under Section 1 above with respect to the Excluded Inventions generally listed below, the intellectual property rights and duty of confidentiality with respect to which I owe to the following party(ies):

| Excluded Invention | Party(ies) | Relationship |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |

☐ Additional sheets attached.