UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALPHA CAPITAL, LLC,<br><br>　　　　　　　　　　　　Plaintiff,<br><br>v.<br><br>DMITRY KHANUKOV et al.,<br><br>　　　　　　　　　　　　Defendants. | Case No.: 3:23-cv-1265-JES-DEB<br><br>**ORDER GRANTING EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**<br><br>**ECF No. 3** |

Presently before the Court is Plaintiff Alpha Capital, LLC's ("Alpha") Ex Parte application for a Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction. ("Ex Parte App," ECF No. 3.) The Court held a hearing on July 21, 2023, where counsel for Defendant Dmitry Khanukov ("Khanukov"), Lana Rishina, appeared on his behalf. For the reasons stated below, the Court **GRANTS** Plaintiff's Motion for Temporary Restraining Order ("TRO") and temporarily **ENJOINS** Dimitry Khanukov, from (1) improperly withholding Alpha's Assets, (2) using Alpha's confidential and proprietary information, and (3) accessing Alpha's protected computers, computer databases, and accounts with electronic service providers. Defendant is further **ORDERED** to immediately return Alpha's assets to Alpha by no later than July 31,

2023.

## I.  BACKGROUND

Alpha is a full-service technology and business development consulting service with a specialization in blockchain and related technologies. (Ex Parte App at 5.) On June 1, 2022, Alpha engaged Khanukov as a consultant to be Alpha's Director of Technology. (Ex Parte App at 5.)[1] Khanukov executed a Consulting Agreement ("CA") and a Confidential Information and Invention Assignment Agreement ("CIIA"). (Ex Parte App at 5; Declaration of Colin Breeze ("Dec of Breeze") at Exhibits 1 and 2.) The CA spelled out Khanukov's duties and compensation while the CIIA spelled out specific duties Khanukov owed to Alpha, specifically duties to keep Alpha's proprietary information confidential, to assign any and all new inventions or developments to Alpha, and a duty of loyalty to Alpha (refraining from pursuing competing projects without Alpha's written approval). (Dec of Breeze, Section 4 of Exhibit 2.) Khanukov further agreed that upon his separation from Alpha, he would return to Alpha all of its confidential information and proprietary information that he was privy to, including access to all of the assets. (*Id.* at Sections 2.3, 2.5 and 2.7 of Exhibit 2.) Finally, Khanukov agreed that he would not engage in any engagement or business activity that directly or indirectly competed with Alpha or conflicted with his employment with Alpha without Alpha's express written approval during the pendency of his employment with Alpha. (*Id.* at Section 4 of Exhibit 2.)

In January 2023, Khanukov wrote to Alpha that he intended to open a new business for startups and investors called Go Global. (Ex Parte App at 6.) Alpha declined to approve Khanukov's pursuit of this new business effort, but later learned that in October 2022, Khanukov had indeed started Go Global which appears to be a web-based

---

[1] The Employment Agreement is attached to the Declaration of Colin Breeze. Plaintiff in its application for a TRO lists the CIA and CIIA as Exhibits A and B respectively. That is erroneous. Exhibit 1 is the CA and Exhibit 2 is the CIIA.

service by which investors and project sponsors can interact, ultimately for project sponsors to find investment capital. (*Id.*) Go Global's business overlaps nearly completely with that of Alpha's subsidiary, GoToCrowd, LLC. (*Id.*) Like Go Global, GoToCrowd is also a web-based service by which investors and project sponsors can interact so that sponsors may secure investment capital and GoToCrowd has been in operation since mid-2019. (*Id.*) During his employment with Alpha, Khanukov was directly responsible for GoToCrowd software development and was the key Alpha team member with control over the GoToCrowd software repository and access. (*Id.* at 6-7.)

On June 11, 2023, Khanukov communicated to Alpha that he was terminating his consulting relationship with Alpha. (*Id.* at 9.) Alpha reminded Khanukov of his obligations under the CIIA and CA and asked Khanukov to return to Alpha all access and passwords for Alpha's accounts with the electronic service providers and to return all of Alpha's property and assets. (*Id.* at 4, 9.) Alpha defined its assets as passwords, work product, billing contact information for Alpha's service providers, code repositories for Alpha's projects, website files, and all other information and work product that had been under Khanukov's control through his employment with Alpha. (*Id.* at 4.) Khanukov refused to communicate with Alpha personnel and withheld Alpha's assets. (*Id.*) Since June 15, 2023, GoToCrowd has been entirely offline. (*Id.* at 7.) Alpha no longer controls or even has access to the course code for GoToCrowd, which is being retained by Khanukov. (*Id.*) During the period leading up to Khanukov's departure, Alpha had been engaged in a substantial online marketing push to generate new registrations at GoToCrowd. (*Id.*) Since the GoToCrowd site has been offline, Alpha has had no new registrations and likely has suffered substantial losses of potential users of the GoToCrowd web service. (*Id.*)

In addition, since the start of his consulting relationship with Alpha, Khanukov controlled Alpha's relationship with the website hosting services for Alpha's websites: alphacapital.io; usdd.finance; and gotocrowd.com, among others. (*Id.*) Each of these websites have been unavailable since late June 2023, and each remains under

Khanukov's control. (*Id.*) Since approximately June 18, 2023, Alpha lost all access to its website hosting services and all of its websites. (*Id.*) Alpha has only been able to regain access to one of its websites, alphacapital.io, but all other sites remain dark. (*Id.*) Alpha's business has been substantially impeded as without access to its websites and domain names, Alpha cannot communicate via its company email accounts attached to each such website, all of which are necessary for it to properly operate. (*Id.*) Further, Khanukov has access to dozens of Alpha's electronic service providers, including:

- Google Suite
- Linode
- Sum & Substance
- Hotjar
- Mailchimp
- SendGrid
- Digital Ocean
- Google Voice
- Notion Labs
- Mailgun
- Twilio
- LucidChart
- Figma
- GoDaddy
- KoreConX
- Mail Servers for Alphacapital.io; and gotocrowd.com
- Notion Project Management for each domain/website in the Alpha network
- GoToCrowd code repository
- Ecovery / Woodland code repository
- GetAirDrop code repository
- Seedcoin code repository
- Servers with live versions of GoToCrowd, USDD, Deepskyresort, GetAirDrop, Woodcoin.org, SeedCoin, Virtu, EcoToken, Ecovery Foundation, WoodlandEco, Hermesus, and Alphacapital.io.

which allows Alpha to operate and maintain its network of websites, email, spreadsheets, documents, secure data rooms, management of customer engagement and communication with clients. (*Id.* at 8-9.)

1    To date, Alpha still does not have access to or control over its own websites or
2 email systems and cannot manage its communications accounts and is thereby prevented
3 from operating its business, causing it substantial harm in the form of lost profits and
4 investment capital. (*Id.* at 9.)

5    Alpha filed a complaint for misappropriation of trade secrets under federal and
6 California law, as well as breach of contract. Alpha now moves for a temporary
7 restraining order which orders Khanukov to abide by trade laws and the Employment
8 Agreement.

## II.   LEGAL STANDARD

10   The standard for issuing a TRO is similar to the standard for issuing a preliminary
11 injunction and requires that the party seeking relief show either "(1) a combination of
12 likelihood of success on the merits and the possibility of irreparable harm, or (2) that
13 serious questions going to the merits are raised and the balance of hardships tips sharply
14 in favor of the moving party." *Homeowners Against the Unfair Initiative v. Cal. Building
15 Industry Ass'n.,* 2006 WL 5003362, *2 (S.D. Cal. Jan.26, 2006) (citing *Immigrant
16 Assistance Project of the L.A. County of Fed'n of Labor v. INS,* 306 F.3d 842, 873 (9th
17 Cir.2002)). "These two formulations represent two points on a sliding scale in which the
18 required degree of irreparable harm increases as the probability of success decreases." *Id.*
19 (citations omitted). The underlying purpose of a TRO is to preserve the status quo and
20 prevent irreparable harm before a preliminary injunction hearing may be held. *Granny
21 Goose Foods Inc. v. Bhd. of Teamsters & Auto Truck Drivers,* 415 U.S. 423, 439 (1974).

22   Federal Rule of Civil Procedure 65(b) provides that a court may issue a TRO
23 without notice to the adverse party in limited circumstances where "specific facts in an
24 affidavit or a verified complaint clearly show that immediate and irreparable injury, loss,
25 or damage will result to the movant …." Fed. R. Civ. P. 65(b) (1)(A). The movant must
26 also certify in writing any efforts made to give notice and the reasons why it should not
27 be required. Fed. R. Civ. P. 65(b)(1)(B). Although the restrictions imposed are stringent,
28 they "reflect the fact that our entire jurisprudence runs counter to the notion of court

action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers,* 415 U.S. 423, 438–39 (1974).

### III.   DISCUSSION

#### A. Likelihood of Success on the Merits

Plaintiff must demonstrate a likelihood of success on the merits of its claims, which are (1) misappropriation of trade secrets in violation of the Defend Trade Secrets Act ("DTSA") and California's Uniform Trade Secret Act ("CUTSA"), (2) violation of California's Comprehensive Computer Data and Fraud Access Act, (3) Computer Fraud and Abuse Act, (4) breach of contract, (5) intentional misrepresentation and fraudulent concealment, (6) conversion, (7) negligence, and (8) unlawful and fraudulent business practices in violation of California Business and Profession Code §§ 17200 and 17203. For this order, the Court will only address the first claim.

#### 1.  Trade Secrets Misappropriation

To state a claim for misappropriation of trade secrets under CUTSA, a plaintiff must allege: (1) the existence and ownership of a trade secret, and (2) misappropriation of the trade secret. *Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983, 988 (S.D. Cal. 2012) (citation omitted). A claim for misappropriation under the Defend Trade Secrets Act ("DTSA") has substantially similar elements. *See* 18 U.S.C. § 1836.

##### a.  Trade Secrets

In establishing the existence of a trade secret, "[a] plaintiff need not 'spell out the details of the trade secret,'" *Autodesk, Inc. v. ZWCAD Software Co.*, No. 5:14-cv-1409-EJD, 2015 WL 2265479, at *5 (N.D. Cal. May 13, 2015) (citation omitted), but must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Pellerin*, 877 F. Supp. 2d at 988 (quoting *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 253 (1968)). Both the DTSA and CUTSA define a "trade secret" as:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if-
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3); *see also* Cal. Civ. Code § 3426.1(d). Plaintiff lists the trade secrets at issue in this case as:

> confidential employee data, customer data, customer lists, strategy, business and product development plans, software repositories, contract and pricing terms, marketing materials, product information, designs, formulas, method, developmental or experimental work, improvements, discoveries, inventions, ideas, plans for research and development, customer preferences, internal business operations software and information, social media accounts and passwords and access information, and other information concerning its actual or anticipated business activity.

(Ex Parte App at 11; Compl. ¶ 54.)

Plaintiff argues that all of its trade secrets possessed great independent economic and commercial value to Alpha and secured its ability to run its business. (Ex Parte App at 11.) In particular, the names, contact information, billing information, and service providers were trade secrets because those identities (a) held independent economic value by not being known to competitors and (2) were the subject of reasonable means to keep them secret, by keeping it password protected and limiting access to only those with a business need to have access, and by virtue of being stored on Alpha's secure computer databases. (*Id.*) Further Alpha argues that its software code repository is a trade secret because it was developed over a significant period of time, including before Khanukov's employment with Alpha. (*Id.*, Dec of Breeze at ¶ 15.) Alpha argues that this information

would have a significant economic value to any competitors, as they could rebuild Alpha's business or use the information to redirect business away from Alpha and to a competing project. (Ex Parte App at 11.) Once that occurs, Alpha argues it would be unable to re-establish those relationships, especially here where Alpha argues that Khanukov has taken the entirety of Alpha's computer database, preventing Alpha from being able to manage its business entirely. (*Id.* at 11-12.)

Alpha has demonstrated that its service providers, customer information and software code repository are not generally known or readily ascertainable through proper means. *See MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 521 (9th Cir. 1993) (finding a customer database qualifies as a trade secret because the database has "potential economic value because it allows a competitor . . . to direct its sales efforts to those potential customers"); *see also Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) ("Customer information such as sales history and customer needs and preferences constitute trade secrets"); *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1522 (1997) ("[A] customer list can be found to have economic value because its disclosure would allow a competitor to direct its sales efforts to those customers who have already shown a willingness to use a unique type of service or product as opposed to a list of people who only might be interested." (citation omitted)). Alpha has established that it has protectable trade secrets.

### b. Misappropriation

Misappropriation is defined as:

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (2) Disclosure or use of a trade secret of another without express or implied consent by a person who:
> > (A) Used improper means to acquire knowledge of the trade secret; or
> > (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:
> > > (i) Derived from or through a person who had utilized improper means to acquire it;

>> (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;
>> (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
> (C) Before a material change of his or her position knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or by mistake.

Cal. Civ. Code § 3426.1(b).[2] Misappropriation under the DTSA is nearly identical. *See* 18 U.S.C § 1839(5).

Alpha argues it has established misappropriation through both the "acquisition" and "use" method as Khanukov has refused to turn over control of Alpha's computer systems, software repositories, passwords, work product, billing contact information for Alpha's service providers, code repositories for Alpha's projects, website files, and all other information and work product that had been under Khanukov's control during his work with Alpha. (Ex Parte App at 12.) Alpha argues that Khanukov effectively took all of Alpha's confidential and proprietary information and trade secrets for himself by denying Alpha access to the information and the ability to use it to conduct business. (*Id.*) Further, Alpha argues that Khanukov's refusal to turn over Alpha's trade secrets is a "breach of duty to maintain secrecy" under the DTSA. (*Id.*) Khanukov has also launched Go Global, which competes with GoToCrowd, using Alpha's trade secrets, taking business away from Alpha. (*Id.*)

Khanukov acquired knowledge of trade secret information through improper means. "Improper means" is defined as "theft, bribery, misrepresentation, breach or

---

[2] The plaintiff "must plead facts showing that [defendant] had a duty not to use the information in the way alleged." *Space Data Corp. v. X*, No. 16-CV-03260-BLF, 2017 WL 5013363, at *2 (N.D. Cal. Feb. 16, 2017). Plaintiff has done this by producing the Employment Agreement. *See Blindlight, LLC v. Cubbison*, No. CV17-3497 JAK (PLAx), 2017 WL 4769460, at *11 (C.D. Cal. July 3, 2017) (finding that confidential agreement signed by the defendant is sufficient to show the defendant "should have known that the information he acquired while an employee of [plaintiff] was 'acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use,' as required to show misappropriation" (quoting Cal. Civ. Code § 3426.1).)

inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6); Cal. Civ. Code § 3426.1(a). This requirement is met as Khanukov had a duty to maintain the secrecy of the information even after he left the company.

The Court finds Alpha has sufficiently alleged a likelihood of success on the merits for its trade secret misappropriation claim.

### B. Imminent Irreparable Harm

Alpha asserts it "is suffering the irreparable and immediate harm of losing all control over its Assets, its electronic service provider accounts and the information stored on them, … [its] trade secrets and all economic value derived from having those secrets … particularly true here, where Khanukov has taken the entirety of Alpha's computer database, thereby preventing Alpha from being able to manage its business entirely." (Ex Parte App at 19.) Further, "without the logins and passwords and software code that Khanukov refuses to return to Alpha, Alpha is unable to effectively conduct its business as it cannot communicate via its websites at all." (*Id*.) Alpha asserts Khanukov's actions has caused Alpha "a substantial loss of business, loss of goodwill, damage to its reputation, and loss of business opportunities." (*Id*.)

"[E]conomic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award." *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (citing *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980)). However, "an intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost always certainly show irreparable harm." *Pac. Aerospace & Elec., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1198 (E.D. Wash. 2003) (quoting *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92–93 (3rd Cir. 1992)). "Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001).

Here, Alpha has established it is unable to operate its business at all and will lose customers and goodwill through Khanukov's actions, which shows there is a likelihood of irreparable injury if Khanukov is not enjoined. This is true despite the fact that Alpha has been communicating with Khanukov and his counsel for nearly 30 days to regain access to its trade secrets. This satisfies the burden with respect to this factor.

### C. Balance of Equities

"To qualify for injunctive relief, Plaintiff must establish that 'the balance of the equities tips in [its] favor.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20). A court has the "duty . . . to balance the interests of all parties and weigh the damage to each." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980). The damage to Alpha, as noted above, is the loss of its entire business, customers and goodwill. There does not appear to be any harmful effect on Khanukov. This TRO does not preclude him from working in his desired industry, he is only precluded from using Alpha's trade secrets in doing so. This is only a small harm, compared to Plaintiff's irreparable harm of loss of business and goodwill. The balance of equities tip in Plaintiff's favor.

### D. Public Interest

"The public interest is served when [a] defendant is asked to do no more than abide by trade laws and the obligations of contractual agreements signed with [his] employer. Public interest is also served by enabling the protection of trade secrets." *Henry Schein*, 191 F. Supp. 3d at 1078 (citing *Bank of Am., N.A. v. Lee*, No. CV 08–5546 CAS (JWJX), 2008 WL 4351348, at *7 (C.D. Cal. Sept. 22, 2008).) Accordingly, the public interest is served in ordering Khanukov here to abide by trade laws and protect Alpha's trade secrets.

/ / /

/ / /

## IV. CONCLUSION

Therefore, the Court finds Alpha has met its burden in establishing it is entitled to injunctive relief. The Court **GRANTS** Alpha's motion for a TRO.

Accordingly, the Court **ENJOINS** Khanukov from (1) improperly withholding Alpha's Assets, (2) using Alpha's confidential and proprietary information, and (3) accessing Alpha's protected computers, computer databases, and accounts with electronic service providers.

**IT IS FURTHER ORDERED** that Khanukov must immediately return Alpha's Assets to Alpha by no later than July 31, 2023.

The Court **ORDERS** Khanukov to show cause as to why the Court should not grant Alpha's motion for a preliminary injunction. The Court **ORDERS** the Parties to appear on August 4, 2023, at 9:00 a.m. in Courtroom 4B for oral argument. Alpha's moving papers shall be due on July 28, 2023. Khanukov's opposition papers shall be due on August 1, 2023. Alpha's reply papers shall be due on August 3, 2023.

**IT IS SO ORDERED**.

Dated: July 21, 2023

Honorable James E. Simmons, Jr.
Unites States District Judge